LESLEE GRINNELL,

     Plaintiff,

v.

CITY OF TAYLOR, *et al*.,

     Defendants.

Case No. 17-11354
Honorable Laurie J. Michelson

---

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [72]

---

In the early hours of September 1, 2014, the City of Taylor Police Department received a call from Brittany Ingram, Plaintiff Leslee Grinnell's daughter. Ingram, clearly distraught, requested a wellness check on Grinnell because he had threatened to kill himself and was currently in his trailer with multiple firearms. Armed police officers surrounded Grinnell's trailer while a corporal spoke with Grinnell over the phone and eventually convinced him to exit the trailer with his hands in the air.

According to the police officers at the scene, they then converged on Grinnell and ordered him to put his hands behind his back and get on the ground. After he refused to comply, the officers used the minimal force necessary to handcuff and search him in order to ensure the safety of the officers.

Grinnell's account is much different. He says that as soon as he exited the trailer, one of the officers ran up to him and punched him in the face without provocation. Grinnell alleges that he was then surrounded by officers who tackled him to the ground and savagely kicked and punched him, even after he was handcuffed. So Grinnell sued the City of Taylor and the eight

police officers he believes were at the scene for, among other things, excessive force in violation of the Fourth Amendment.

The individual officers ("the Officers") now seek summary judgment. The City of Taylor ("the City") previously moved for summary judgment on statute-of-limitations ground, which was denied, but now moves for leave to seek summary judgment on liability grounds. The Court held a hearing on the motion on April 16, 2021. For the reasons stated below, the motion is granted in part and denied in part. Grinnell may proceed to trial only on his claim of excessive force related to his alleged assault while he was subdued on the ground and only against five of the nine officers sued.

## I.

At the summary-judgment stage, it usually suffices to present the non-moving party's version of the facts supplemented by any undisputed evidence. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Here, however, the analysis is aided by presenting both Grinnell's account and the Officers'.

## A.

The Court begins with Grinnell's account. Grinnell's testimony is not the picture of clarity, but the Court attempts to represent all of his key allegations in the light most favorable to Grinnell.

On the evening of August 31, 2014, Grinnell was at home in his trailer in Taylor and called his adult daughter Brittany Ingram to find out the location of his two-year-old son (Brittany's brother). (ECF No. 72-9, PageID.1303.) Ingram originally said that the boy was with her, but then admitted that her mother had taken him with her on a date with a man she had met online. (*Id.*) Grinnell and Ingram had a number of heated phone exchanges, and eventually Grinnell said to

Ingram "what [] does it take for you people to leave me alone? Do I have to kill myself or pay somebody to come over here and off me?" (*Id.* at PageID.1304.)

Grinnell invited some of his friends over and vented with them. (*Id.*) Eventually the friends went out to get something to eat and when they returned, they informed Grinnell that the Taylor Police were outside his trailer. (*Id.*) Grinnell told his friends he was not leaving the trailer and asked them to convey to the police that he would not be leaving, and they could come into the trailer to talk to him. (*Id.* at PageID.1305.)

Grinnell remained in his trailer and eventually answered a phone call from Corporal W. Brinker, who was located at the police station. (*Id.* at PageID.1307.) Brinker assured Grinnell he had not broken any laws and asked him to come out of his trailer and talk with the police. (*Id.*) Brinker assured Grinnell no one would lay a hand on him. (*Id.*) Grinnell feared he would be beaten by the police, but eventually agreed to come outside. (*Id.* at PageID.1314.)

As soon as Grinnell stepped off his front stairs, an unidentified officer came running around the corner and began punching him in the face repeatedly. (*Id.* at PageID.1315.) Grinnell put his hands up and stepped back. (*Id.* at PageID.1316.) Suddenly, several other officers came running up yelling at him to get on the ground. (*Id.* at PageID.1316, 1319.) Grinnell refused to get on the ground, saying "I'm not your dog." (*Id.* at PageID.1319.) A group of officers threw Grinnell onto the ground, held him facedown, and began hitting, kicking, and choking him. (*Id.* at PageID.1316, 1319; ECF No. 72-10, PageID.1338, 1358–1359.) A "blonde" female officer stood off to the side watching. (ECF No. 72-9 at PageID.1316–1317.) Although Grinnell is not able to identify any of the officers or how many officers were involved in the assault, he stated that "nine of them were standing there" (ECF No. 72-10, PageID.1340) either participating in or observing the assault. He estimates that six or seven of them were kicking or punching him. (*Id.* at PageID.1359.) Eventually,

the officers succeeded in handcuffing Grinnell.[1] One of the officers gave Grinnell a final kick in the ribs and said "ha, ha, motherf\*\*ker." (*Id.*) Grinnell was then transported to the hospital for evaluation (*Id.* at PageID.1323.)

The hospital records reflect that Grinnell had swelling and superficial lacerations on his face and he reported jaw and rib pain. (ECF No. 76-5, PageID.2084–2085.) Grinnell was cleared for discharge after a psychological evaluation. (*Id.* at PageID.2092.) Grinnell has also reported back and leg pain, blurred vision, and loss of hearing, which he attributes to the assault. (ECF No. 76, PageID.1967.)

## B.

The Officers tell the story very differently. In the early hours of the morning on September 1, the Taylor Police received a call from Ingram asking the police to conduct a welfare check on her father because he had threatened to kill himself and had firearms in his home. (ECF No. 72-1.) Corporal Brinker attempted to reach Grinnell by phone, but he did not answer. (ECF No. 72-4, PageID.1111.) Meanwhile, Brinker dispatched officers to Grinnell's home. (*Id.* at PageID.1109.) Although neither party has confirmed exactly how many officers responded to the scene, the Platoon Log suggests there were nine officers. (ECF No. 75-2.) Two of the officers listed on the log, Zuccaro and Paredes, are not defendants in this case.

The police classified Grinnell as a "barricaded gunman" because Grinnell was reportedly armed and suicidal inside his trailer. (ECF No. 72-5, PageID.1158; ECF No 72-7, PageID.1234.) Officers arrived at Grinnell's property around 3:00 a.m. and set up a perimeter surrounding his trailer. (ECF No. 72-5, PageID.1136, 1141, 1144, 1154; ECF No. 72-7, PageID.1236; ECF No.

---

[1] In his first deposition, Grinnell testified it was after about a minute (ECF No. 72-9, PageID.1320), but in his second deposition two years later he said he was handcuffed "as soon as they threw me on the ground" (ECF No. 72-10, PageID.1353).

72-8, PageID.1266–1267; ECF No. 72-14, PageID.1540; ECF No. 72-15, PageID.1589–1590.) One officer, John Regan, interviewed Grinnell's friends and learned that Grinnell had two guns, was getting dressed in full body armor, and had fired one of his guns inside the trailer. (ECF No. 72-6, PageID.1187–1188; ECF No. 72-2.)

Brinker eventually reached Grinnell by phone and found him to be agitated and upset. (ECF No. 72-4, PageID.1111–1113.) These phone calls are captured on audio tape and confirm Grinnell's upset, primarily involving his personal life and issues with his ex-partner. (ECF No. 72-2.) Brinker eventually convinced Grinnell to exit the trailer by promising that he would not be handcuffed or put on the ground. (*Id.* at PageID.1113–1114, 1118.) Although Grinnell said he was not going to get down on the ground, Brinker repeatedly told him to do what the officers asked. (ECF No. 72-1.)

Grinnell exited the trailer with one hand up and one hand holding his phone since he was still speaking with Brinker. (ECF No. 72-2; ECF No. 72-4, PageID.1120; ECF No. 72-7, PageID.1239.) The officers began advancing on Grinnell from their various positions on the perimeter and giving him loud verbal commands to put his hands in the air and to get on the ground. (ECF No. 72-4, PageID.1120; ECF No. 72-5, PageID.1145; ECF No. 72-6, PageID.1200; ECF No. 72-7, PageID.1236; ECF No. 72-15, PageID.1597.) Grinnell refused to comply and repeatedly stated that he would not get on the ground and that Brinker had promised he would not have to get on the ground or be handcuffed. (ECF No. 72-2; ECF No. 72-9, PageID.1319.) Brinker, who was still on the phone, told Grinnell to put the phone down and listen to the officers. (ECF No. 72-2.)

Officers Adam Leffew and Nicholas Wellman were closest to Grinnell when he exited the trailer. They advanced on him together, giving him verbal commands for about one minute to put his hands behind his back and to get on the ground. (ECF No. 72-2; ECF No. 72-7, PageID.1238;

ECF No. 72-14, PageID.1544.) At this point, other unidentified officers had also advanced and stood nearby. (*See, e.g.*, ECF No. 72-14, PageID.1545 (estimating about five other officers advanced); ECF No. 72-15, PageID.1600 (estimating about 10 officers converged on Grinnell).) After Grinnell continually refused to comply, Wellman and Leffew each took hold of one of Grinnell's arms and attempted to pull them behind his back in order to cuff him. (ECF No. 72-2, PageID.1238, 1240; ECF No. 72-14, PageID.1541, 1544.) But Grinnell actively resisted and pulled his arms forward. (ECF No. 72-2, PageID.1240; ECF No. 72-14, PageID.1553.) According to Wellman and Leffew, this movement caused the officers to lose their balance, and they all fell to the ground along with Grinnell. (ECF No. 72-7, PageID.1240; ECF No. 72-14, PageID.1553; *see also* ECF No. 72-11, PageID.1482.)

The deposed officers gave ambiguous and conflicting testimony about whether other officers were involved with trying to handcuff Grinnell. For example, Officer Porta remembers seeing another "two or three" officers engaged with Grinnell but could not identify which officers or the details of their involvement. (ECF No. 72-5, PageID.1147–1152.) Officer Vines said he was "sure there was someone else with [Wellman and Leffew]," but could not say who. (ECF No. 72-8, PageID.1268.) Officer Thivierge remembered seeing three or four officers in a pile in the ground with Grinnell but could not remember who. (ECF No. 72-11, PageID.1482–1483.) Even Leffew remembered other officers being involved with taking Grinnell down to the ground. Leffew testified that while he was grabbing Grinnell's arm, he lost his balance and was struck by another officer. (ECF No. 72-14, PageID.1553.) Leffew then disengaged because "there were so many other officers there." (*Id.*) In contrast to Leffew's testimony, Wellman "could not say" whether there were any other officers helping to cuff Grinnell. (ECF No. 72-7, PageID.1240, 1244.)

Wellman and these other unidentified officers spent about 30 seconds struggling with Grinnell on the ground before they were able to handcuff him. (ECF No. 72-5, PageID.1151; ECF No. 72-7, PageID.1242; ECF No. 72-8, PageID.1269–1270; ECF No. 72-11, PageID.1483; ECF No. 72-15, PageID.1606.) The other officers provided cover from varying distances until Grinnell was secured. (ECF No. 72-5, PageID.1146; ECF No. 72-6, PageID.1202 (Regan 75-100 yards away); ECF No. 72-8, PageID.1269 (Vines four or five feet away); ECF No. 72-11, PageID.1481 (Thivierge 20 to 30 feet away). *But see* (ECF No. 72-15, PageID.1599 (Officer Carroll testified that he saw approximately 10 officers converge around Grinnell).)

All of the deposed officers who were at the scene testified that they did not see anyone hit, kick, or otherwise strike Grinnell. (ECF No. 72-5, PageID.1154; ECF No. 72-6, PageID.12-6; ECF No. 72-7, PageID.1252; ECF No. 72-8, PageID.1274; ECF No. 72-11, PageID.1493; ECF No. 72-14, PageID.1566; ECF No. 72-15, PageID.1631.)

After Grinnell was handcuffed, he was transported to the hospital by Regan and Carroll without further incident. (ECF No. 72-15, PageID.1608.)

## II.

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. "A fact is material only if its resolution will affect the outcome of the lawsuit." *Hedrick v. Western Reserve Care Sys.*, 355 F.3d 444, 451–52 (6th Cir. 2004) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). And "a dispute about a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Scott v. First S. Nat'l Bank*, 936 F.3d 509, 516 (6th Cir. 2019) (internal citations omitted).

### III.

In his amended complaint, Grinnell brings six claims against the City of Taylor and nine individual police officers: W. Brinker, Nicholas Wellman, Adam Leffew, S. Porta, Renee Rosebohm, Adam Carroll, John Regan, and Joe Thivierge.[2] (ECF No. 48.) Before turning to the merits, the Court will address Grinnell's renewed state-law claims and clarify the status of his federal law claims.

### A.

Grinnell's amended complaint contains three state-law claims that the Court has already dismissed because the Court declined to exercise supplemental jurisdiction over them. (*See* ECF No. 5.) The reasons for the Court's decision have not changed, and Grinnell is not entitled to reinstate these counts in his amended complaint. So Counts II, III, and IV are DISMISSED.

### B.

Grinnell asserts three federal claims in this suit: one *Monell* claim alleging municipal liability for the excessive use of force by the Taylor Police Department (Count I), and two additional claims against the individual police officers (Count V and Count VI).

Of Grinnell's two claims against the individual officers, only one is viable as a matter of law. Unfortunately, neither count is the picture of clarity. Count V simply incorporates the prior allegations and states that the officers violated 42 U.S.C. § 1983. The parties seem to interpret this count as a claim of excessive force in violation of the Fourth Amendment.[3] (ECF No. 72,

---

[2] The parties spell Mr. Thivierge's name as "Thivierage," but his deposition makes clear that he spells his name "Thivierge" (ECF No. 72-11, PageID.1464).

[3] Although Count I also mentions due process and equal protection, the parties do not address either in their briefing, and the Court cannot identify allegations to support these claims. So the Court will follow the parties' lead and interpret Count I and Count V as excessive force claims.

PageID.916; ECF No. 76, PageID.1976.) Count VI is titled as a violation of the "constitutional requirement forbidding cruel and unusual punishment." (ECF No. 48, PageID.675.) The Court presumes this is intended to be a claim under the Eighth Amendment, since that is the portion of the United States Constitution that prohibits cruel and unusual punishment. But the Eighth Amendment only applies to a criminal defendant that has been formally adjudicated as guilty. *City of Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239, 244 (1983); *see also Watkins v. City of Battle Creek*, 273 F.3d 682, 685 (6th Cir. 2001) ("The Eighth Amendment does not apply to pretrial detainees."). To the extent that Count VI contains allegations of excessive force by the Taylor Police, these allegations are subsumed under Counts I and V.

So there are two counts before the Court on summary judgment: the *Monell* claim against the City (Count I) and the excessive force claims against the individual officers (Count V).

**IV.**

The Court turns to the merits and addresses the claim against the individual officers first. Grinnell's claim for excessive force by the Officers arises under the Fourth Amendment. The Fourth Amendment prohibits "unreasonable . . . seizures." And an arrest completed with excessive force is an unreasonable seizure. *Barton v. Martin*, 949 F.3d 938, 952 (6th Cir. 2020). Even an officer who never touched the plaintiff can be liable for excessive force if he "supervised the officer who used excessive force, or [] owed the victim a duty of protection against the use of excessive force." *Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2010) (quoting *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997)).

**1.**

The Officers' main challenge to Grinnell's excessive force claim is grounded in one of the essential elements of a § 1983 claim: "Section 1983 imposes liability only on a defendant who was

personally involved in the unconstitutional action that caused the plaintiff's injury." *Pineda v. Hamilton Cty., Ohio*, 977 F.3d 483, 491 (6th Cir. 2020). With this principle in mind, Defendants argue that Grinnell cannot satisfy the requirement of Federal Rule of Civil Procedure 56 that he "present evidence from which a jury could conclude that it was more likely than not that [each] defendant was involved." *Id.* at 491.

A police officer is only liable for his own actions under 42 U.S.C. § 1983 and a plaintiff must prove that each police officer was personally involved in the alleged constitutional violation. *See id.* (internal citation omitted). So the Officers argue that because Grinnell "cannot even identify a single officer, let alone associate any alleged excessive force with a specific police officer" his claims against them must be dismissed. (ECF No. 72, PageID.919.)

Grinnell does not dispute that he cannot identify any of the Officers or which officer is responsible for each unconstitutional action he alleges. He represented at his first deposition that he planned to attend the depositions of the police officers so that he could identify them. (ECF No. 72-9, PageID.1319.) But at his second deposition, Grinnell admitted that he did not attend any of the officers' depositions. (ECF No. 72-10, PageID.1337.) To this day, Grinnell cannot identify any of the officers by name. (*Id.* at PageID.1338, 1451; ECF No. 76, PageID.1957.)

But, argues Grinnell, his inability to identify the officers is not fatal to his claims. Grinnell relies on two recent cases from the United States Court of Appeals for the Sixth Circuit: *Fazica v. Jordan*, 926 F.3d 283 (6th Cir. 2019), and *Pineda v. Hamilton Cty., Ohio*, 977 F.3d 483 (6th Cir. 2020).

In *Fazica*, the plaintiff was allegedly physically and sexually abused by officers while in pretrial detention but was unable to identify which of the five officers present was responsible for each act because the officers had placed a spit mask over her head that prevented her from seeing.

926 F.3d at 285. Even though the plaintiff "was unable to identify clearly which officers committed specific acts during the incident," the Sixth Circuit held that "where a plaintiff . . . produces evidence that places an individual defendant in a small group of officers that committed allegedly unconstitutional acts within each other's presence, the plaintiff's claim against that defendant may survive summary judgment." *Id.* at 292 (internal citations omitted). The court emphasized that the plaintiff must offer evidence that "each particular defendant committed a specific constitutional violation" but that, in the context of excessive force, this includes both officers who personally applied the force and officers who witnessed the excessive force and failed to intervene. *Id.*

In *Pineda*, the court distinguished *Fazica,* noting that "[w]e have applied *Fazica*'s rule only when a plaintiff presented sufficient evidence that each particular defendant committed a specific constitutional violation." 977 F.3d at 493 (internal citation omitted). The court clarified that *Fazica*'s rule "does not relieve the plaintiff of the burden to create a triable issue of fact over whether every defendant has violated the Constitution." *Id.* Pineda could not make use of *Fazica*'s rule because he conceded that only one of the three officers he sued had committed a constitutional violation. *Id. Pineda* also clarified that the Sixth Circuit has only applied *Fazica*'s rule "when circumstances beyond [the plaintiff's] control made the plaintiff unable to learn the identity of the defendants who violated the plaintiff's constitutional rights." *Id.* (internal citation omitted). The Sixth Circuit has not given guidance on whether the *Fazica* rule applies when only one of these conditions are present (i.e. if all of the defendants could be liable, but the plaintiff failed to identify the defendants despite his ability to do so).

Grinnell argues that because all of the Officers "either participated in the assault or [] failed to intervene," they are all part of a "group of officers that committed allegedly unconstitutional acts within each other's presence," *Fazica*, 926 F.3d at 292, and thus are all responsible for

violating Grinnell's constitutional rights. (ECF No. 76, PageID.1977–1978.) But this statement in Grinnell's response is not fully supported by the record, including his own deposition.

First, there is the issue that two of the named officers were not at the scene. Grinnell concedes that Corporal Brinker was not at the scene but was instead located at the police station and communicating with Grinnell and the other officers by phone and radio. (ECF No. 72-9, PageID.1307; *see also* ECF No. 72-4, PageID.1116 (Brinker testified under oath that he was at the station during the entire incident).) Brinker was working dispatch that evening (*id.* at (PageID.1114, 1123), and Grinnell presents no evidence to suggest Brinker supervised the officer or officers who used excessive force, such that he could be personally liable. So based on the undisputed facts, Grinnell cannot state a claim for excessive force against Brinker and he will be dismissed.

Renee Rosebohm also provides undisputed evidence that she was not present at the scene on the night of Grinnell's arrest. In a sworn declaration, Rosebohm explains that she was not at the scene and her only involvement in the case was responding to a Freedom of Information Act request from Grinnell. (ECF No. 72-16.) And Grinnell does not create a genuine issue of fact on this point. In his deposition, Grinnell testified that there was a blonde woman present at the scene, but he was unable to identify her by name. (ECF No. 72-9, PageID.1316–1317.) Defendants' attorney apparently erroneously identified the blonde woman as Rosebohm, but Grinnell himself never independently identified Rosebohm as present at the scene. So, as his counsel conceded at oral argument, Grinnell cannot genuinely dispute that Rosebohm had no involvement in Grinnell's arrest. Thus Rosebohm will be dismissed.

That leaves seven named officers, Nicholas Wellman, Adam Leffew, Chad Vines, S. Porta, Adam Carroll, John Regan, and Joe Thivierge, all of whom admit they were present at the scene of Grinnell's arrest.[4]

Although the facts of which officers engaged with Grinnell once he stepped out of the trailer, and what happened in the ensuing struggle, are highly contested, at summary judgment the Court must view the facts in the light most favorable to Grinnell. There was no video recorded at the scene, and the audio provided by the Officers captures only about one minute after Grinnell exited the trailer, so the Court relies principally on the deposition testimony of Grinnell and the Officers.

Grinnell alleges three separate applications of excessive force during his arrest: (1) one officer punching him in the face as soon as he stepped off his porch, (2) a group of officers throwing him onto the ground, and (3) a group of officers punching, kicking, and choking him while he was facedown on the ground.

Grinnell's first allegation of excessive force is that, soon after he stepped outside, an unidentified officer ran up to him and began punching him in the face and head. (ECF No. 72-9, PageID.1315.) Grinnell testified that the officer hit him "five or six times" in quick succession. (*Id.* at PageID.1316.) Aside from the attacker, the only officer that Grinnell says observed this happening was the unidentified blonde woman. (*Id.*) But none of the remaining seven named officers are women. So for this initial assault, Grinnell alleges that one officer is responsible for excessive force, but the other six neither used excessive force nor could have stopped it. This is analogous to the situation in *Pineda*, in which "two of the deputies in this case committed no

---

[4] As noted above, there are two other officers that may have been at the scene but are not parties to this suit.

harmful acts and 'are innocent in a way in which the defendants in *Summers* [*v. Tice*, 199 P.2d 1 (Cal. 1948)] and [*Fazica*] were not[.]'" *Pineda*, 977 F.3d at 493 (quoting *Hessel v. O'Hearn*, 977 F.2d 299, 305 (7th Cir. 1992)). Also, like in *Pineda*, Grinnell "has not identified circumstances beyond his control that kept him from learning the identity of the deputy who supposedly struck him." *Id.* at 494. Grinnell said that the officer hit him square in his face, and he was able to provide a general description of a young man with light brown hair and stated that he would be able to identify the officer if he saw him again. (ECF No. 72-9, PageID.1315.) Yet Grinnell made no efforts to identify the officer he alleges punched him in the face. He had ample opportunities to do so during discovery, and had even agreed to attend the deposition of each officer to try to identify him or her on the record—but inexplicably never showed up. (ECF No. 72-10, PageID.1337.) So Grinnell has failed to present evidence from which a reasonable jury could conclude that it is more likely than not that any specific defendant punched him in the face and cannot proceed with this specific allegation of excessive force. *See Pineda*, 977 F.3d at 492.

Grinnell's other allegations of excessive force revolve around being handcuffed. Grinnell's own testimony about what happened is not entirely clear, but essentially, he says that a number of officers converged on him, grabbed him, threw him facedown on the ground, and then punched, choked, and kicked him. (ECF No. 72-9, PageID.1316, 1319; ECF No. 72-10, PageID.1338, 1340, 1358.) He says the assault lasted for about one or one-and-a-half minutes. (ECF No. 72-9, PageID.1320; ECF No. 72-10, PageID.1352.)

The Court takes first Grinnell's allegation that officers used excessive force when they took him down to the ground. Grinnell testified in his depositions that after the first officer punched him in the face, three or four other officers came running at him from behind and from his right side and threw him to the ground within a few seconds. (ECF No. 72-9, PageID.1316; ECF No.

72-10, PageID.1352–1353, 1367.) Grinnell testified that he might be able to identify the three or four officers if he saw them again. (ECF No. 72-9, PageID.1318.) Again, he did not make any attempts to identify them after this statement in his 2018 deposition. With seven named officers remaining in this suit, this means that, at a minimum, three were not physically involved in the takedown.

Nor can they be liable for failure to intervene. A police officer can be liable for failure to intervene during the application of excessive force when: "(1) the officer observed or had reason to know that excessive force would be or was being used; and (2) the officer had both the opportunity and the means to prevent the harm from occurring." *Goodwin v. City of Painesville*, 781 F.3d 314, 328 (6th Cir. 2015) (internal quotation omitted). Generally, "an excessive use of force lasting ten seconds or less does not give a defendant enough time to perceive the incident and intervene' to stop such force." *Pineda*, 977 F.3d at 493 (quoting *Alexander v. Carter for Byrd*, 733 F. App'x 256, 264–65 (6th Cir. 2018)) (quotation marks omitted). Grinnell testified that it took the officers only a few seconds to get him to the ground. And nothing else in the record evidence in this case suggests that the other officers present at the scene would have had the opportunity to intervene to stop the three or four officers from taking Grinnell down.

So the Court is faced with another *Pineda* problem. Only one officer, Wellman, admits to being physically involved in getting Grinnell on to the ground. (ECF No. 72-7, PageID.1240–1242.) And although Leffew claims he disengaged from Grinnell after originally trying to handcuff him while he was standing, other officers (including Wellman) testified that he was physically involved in bringing Grinnell to the ground. (ECF No. 72-14, PageID.1553; ECF No. 72-7, PageID.1240; ECF No. 72-11, PageID.1482; ECF No. 72-8 PageID.1269.) So viewing the facts in the light most favorable to Grinnell, Wellman and Leffew both participated in taking Grinnell to

the ground. But Grinnell has not identified which of the other five officers were involved and which were not, despite testifying that he had a view of those involved and might be able to identify them. So as to Porta, Regan, Vines, Thivierge, and Carroll, Grinnell has not "present[ed] evidence from which a jury could find that each defendant engaged in" the takedown. *Pineda*, 977 F.3d at 493.

Finally, the Court will address the *Pineda* issue as it relates to Grinnell's allegations of assault once he was on the ground. These facts are even more muddled. Grinnell testified that he was held facedown on the ground while a group of officers punched, kicked, and choked him. Grinnell maintains that he does not know precisely how many officers were involved because his face was in the dirt. At various points of his deposition he testified that there were "six or seven taking turns on me" (ECF No. 72-10, PageID.1359), "seven of them were on me, three of them were standing around. One guy was standing there with an AR15" (*id.* at PageID.1360), and that "[n]ine of them were standing there. Nine of them were bad cops. . . . Nine of them did all this damage to me." (*id.* at PageID.1340).

Regardless of the exact number, Grinnell also testified there were one or two officers who were at the scene but not in close proximity to him during the assault. According to Grinnell's testimony and the map of the scene that he drew, there was one officer standing in the street and another located across the street by his neighbor's shed. (ECF No. 72-9, PageID.1318; ECF No. 79.) When asked about the involvement of these officers during the assault, Grinnell testified that "he did not know what happened" to the officer who was standing in the street, and that he did not know "what happened to [the officer] or what he did to [Grinnell] if anything." (ECF No. 72-9, PageID.1318.) And Grinnell testified as to the other officer, who was by the shed, "by the time he got over . . . it was done. He just walked up and stood by the tree." (*Id.*) Grinnell confirmed that

the officer by the shed "didn't participate in any sort of physical abuse." (*Id.*) In his second deposition, Grinnell again confirmed that there was at least one officer who "didn't quite make it" over to the scene of the handcuffing, although that officer "did get across the street. He kind of just stood there with an AR15." (ECF No. 72-10, PageID.1351)

To summarize Grinnell's testimony about being assaulted while on the ground, the actions of the officers at the scene all fall into one of three buckets: (1) an unknown number of officers who attacked Grinnell while he was on the ground, (2) an unknown number of officers who stood close by during the assault and possibly could have intervened, and (3) at least one, and likely two, officers that were too far away to have assaulted Grinnell or stopped the assault.

The officers in the first two buckets may fall within the *Fazica* rule as part of "a small group of officers that committed allegedly unconstitutional acts within each other's presence." *Fazica*, 926 F.3d at 292. But any officer that may fall within the third bucket is akin to the officers in *Pineda* who "committed no harmful acts," 977 F.3d at 493.

Although Grinnell cannot identify any of the officers by name, the Court can determine which officers could fall into the third bucket based on the officers' deposition testimony. Of the remaining seven officers, five place themselves within feet of Grinnell while he was being handcuffed (of course none admit to striking him or seeing any other officer strike him). Wellman admits to struggling on the ground with Grinnell. (ECF No. 72-7, PageID.1242.) And Leffew says he disengaged from Grinnell moments before he went down. (ECF No. 72-14, PageID.1553.) Porta testified that although he was originally on the perimeter because he had a long gun, he advanced on Grinnell with a group of officers and was roughly five feet away while the unknown officers took him to the ground and handcuffed him. (ECF No. 72-5, PageID.1146–1147, 1151.) Vines testified that he was originally stationed at the front of the trailer but moved up on Grinnell when

he exited the trailer and got four or five feet away from him when he was on the ground. (ECF No. 72-8, PageID.1268–1269.) And Carroll said he was also part of the group that converged on Grinnell when he exited the trailer. (ECF No. 72-15, PageID.1598.) As other officers handcuffed Grinnell, Carroll observed from five or so feet away. (*Id.* at PageID.1607.) So based on the officers' deposition testimony, Wellman, Leffew, Porta, Vines, and Carroll either made physical contact with Grinnell or stood within five feet of the takedown.

In contrast, Regan and Thivierge testified that they remained on the perimeter until the incident was over and Grinnell was secured. Regan testified that he was between 75 and 100 yards away holding an AR-15 and providing cover. (ECF No. 72-6, PageID.1192, 1196.) He began to approach once Grinnell was on the ground, and by the time he reached Grinnell, the officers had him secured. (*Id.* at 1205–1206.) Thivierge also testified that he was in a cover position behind a neighboring trailer. (ECF No. 72-11, PageID.1471.) As he observed Grinnell exit his home, Thivierge went back around the neighboring trailer to maintain cover about 20 or 30 feet away. (*Id.* at PageID.1480–1481.) This testimony suggests that either or both officers were part of the third bucket that Grinnell described. Because Grinnell has not presented any evidence "from which a reasonable jury could find that it was more likely than not that [Regan and Thivierge were] personally involved in the excessive force," they must be dismissed. *Pineda*, 977 F.3d at 494 (internal quotation omitted).

With Regan and Thivierge dismissed, the remaining five officers—Wellman, Leffew, Porta, Vines, and Carroll—fall within the *Fazica* rule. Because all of these officers place themselves within feet of Grinnell while he was being secured, if Grinnell was indeed subjected to excessive force, these officers are part of a small group of officers which could be liable for either excessive force or failure to intervene. And Grinnell testified that he could not identify the

specific officers who punched and kicked him after he was on the ground because he was being held on the ground by the officers with his face planted in the dirt. (ECF No. 72-10, PageID.1338–1339.) Because Grinnell plausibly alleges that all of these five officers are liable for excessive force or for failing to stop excessive force, and the actions of the officers prevented him from being able to identify which officers took what actions, Grinnell is not required to identify at the summary judgment stage which officer committed which specific act. *Fazica*, 926 F.3d at 292.

**2.**

So the Court is left with two allegations of excessive force: (1) that Wellman and Leffew threw Grinnell to the ground and (2) that Wellman, Leffew, Porta, Vines, and Carroll assaulted Grinnell while he was he on the ground or failed to stop the assault. To determine whether these claims survive summary judgment, the Court must also analyze whether the force alleged was actually excessive. The ultimate question of whether the Officers' actions amount to excessive force is for the court. *See Scott v. Harris*, 550 U.S. 372, 381 n.8 (2007).

To make this determination, the Court applies "the objective-reasonableness standard, which depends on the facts and circumstances of each case viewed from the perspective of a reasonable officer on the scene and not with 20/20 hindsight." *Fox v. DeSoto*, 489 F.3d 227, 236 (6th Cir. 2007) (citing *Graham v. Connor*, 490 U.S. 386, 395–96 (1989)). And the reasonableness of an officer's action must be analyzed based on each segment of the incident. *Barton v. Martin*, 949 F.3d 938, 952 (6th Cir. 2020) (internal quotation omitted). The factors the Court considers to assess reasonableness are "[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest." *Graham*, 490 U.S. at 396–97; *see also Barton*, 949 F.3d at 953.

First take Grinnell's allegation that he was thrown onto the ground by officers. The first *Graham* factor weighs in favor of Grinnell. The Officers originally arrived at Grinnell's home to conduct a wellness check and he was not suspected of any crime. (ECF No. 72-4, PageID.1113 (Corporal Brinker: "He was never under arrest for anything. I don't believe there was a crime at all at that time."); *see also* ECF No. 72-5, PageID.1149.) And at the moment Grinnell was taken to the ground, at most, he had refused a lawful order and resisted arrest. These are not serious crimes. But police officers are entitled to detain and handcuff a suspect even if he is not under arrest in order to ensure the safety of the officers. *See Bletz v. Gribble*, 641 F.3d 743, 755 (6th Cir. 2011) ("[E]ven absent particularized reasonable suspicion, innocent bystanders may be temporarily detained where necessary to secure the scene of a valid search or arrest and ensure the safety of officers and others." (citing *Michigan v. Summers*, 452 U.S. 692, 704–05 (1981))).

The other two factors weigh heavily against Grinnell.

Based on the information the Officers had received from dispatch, it was reasonable to believe Grinnell posed an immediate threat. At the time, the Officers were responding to what they believed to be a "barricaded gunman" situation. (ECF No. 72-5, PageID.1158.) The Officers had been told that Grinnell was suicidal, agitated, armed with multiple weapons, donning full body armor, a military veteran, and had fired a round inside his trailer. (ECF No. 72-4, PageID.1108, 1113; ECF No. 72-6, PageID.1187–1188.) When Grinnell finally exited his trailer, after back-and-forth negotiations with Brinker, it was dark outside, and the Officers did not know whether Grinnell was armed. (ECF No. 72-8, PageID.1268; ECF No. 72-6, PageID.1197; ECF No. 72-7, PageID.1238–1239.) So it was reasonable for the officers to detain and search Grinnell to neutralize the potential threat. And "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it."

*Graham*, 490 U.S. at 396; *see also Standifer v. Lacon*, 587 F. App'x 919, 925 (6th Cir. 2014) ("The Fourth Amendment 'permits an officer to use reasonable force to protect himself from a reasonable threat[.]'" (quoting *Aldini v. Johnson*, 609 F.3d 858, 867 (6th Cir. 2010))).

Moreover, as supported by the audio recording, Grinnell refused to comply with repeated verbal commands to put his hands behind his back and get on the ground. (ECF No. 72-2; ECF No. 72-4, PageID.1120; ECF No. 72-5, PageID.1145; ECF No. 72-6, PageID.1200; ECF No. 72-7, PageID.1236; ECF No. 72-9, PageID.1319; ECF No. 72-15, PageID.1597.) And when Leffew and Wellman tried to bring Grinnell's arms behind his back to handcuff him while he remained standing, he pulled his arms away and stepped back. (ECF No. 72-7, PageID.1240; ECF No. 72-8, PageID.1264; ECF No. 72-14, PageID.1540–1541.). Acts of physical and verbal defiance and resistance justify a reasonable use of force in response. *See, e.g*, *Eldridge v. City of Warren*, 533 F. App'x 529, 533–34 (6th Cir. 2013) ("[A]n officer's use of force was justifiable because it was in response to active resistance, some outward manifestation—either verbal or physical—on the part of the suspect [that] had suggested volitional and conscious defiance."); *Goodwin v. City of Painesville*, 781 F.3d 314, 323 (6th Cir. 2015) ("[Active] resistance can take the form of 'verbal hostility' or 'a deliberate act of defiance.'"). *Cf. Hagans v. Franklin Cty. Sheriff's Off.*, 695 F.3d 505, 509 (6th Cir. 2012) ("If a suspect actively resists arrest and refuses to be handcuffed, officers do not violate the Fourth Amendment by using a taser to subdue him.").

So even if the Officers did "throw" Grinnell to the ground, this use of force was reasonable in the circumstances. The Officers reasonably believed they were in the midst of a highly volatile and dangerous situation. When approached by the Officers, Grinnell told them he would not comply with their orders, and then resisted their efforts to handcuff him. And Grinnell does not allege that he was brought to the ground using a particular type of harsh police tactic like a

chokehold or an arm-bar takedown, instead he suggests that there was a chaotic struggle with a number of officers, and he ended up thrown on the ground. (ECF No. 72-10, PageID.1367, 1421.) Moreover, Grinnell does not seem to allege that he was seriously hurt in the process of the takedown, but that the majority of his injuries were the result of punches and kicks to his body. (ECF No. 72-9, PageID.1320; ECF No. 72-10, PageID.1353, 1378–1379; *see also* ECF No. 76-5, PageID.2084–2085 (hospital records report swelling and superficial lacerations on face as only injuries).) In light of the potential threat to the Officers, and Grinnell's verbal and physical defiance, it was reasonable for the Officers to take Grinnell down to the ground to be better able to secure him and ensure his safety and the safety of the officers. *See Standifer*, 587 F. Appx at 925 (finding it was objectively reasonable to push subject to ground where officer believed she posed a danger to herself and others and attempted to evade restraint, contrasted with cases where officers used harsh tactics like headlocks on subjects not resisting); *Bozung v. Rawson*, 439 Fed. Appx. 513, 520 (6th Cir. 2011) (holding that officer did not use excessive force by using arm-bar takedown on passively resisting suspect when suspect did not comply with officer's orders, repeated for two to three minutes, to put his hands behind his back and it was unclear if suspect posed a threat); *Earnest v. Genesee Cty., Michigan*, No. 20-1342, 2021 WL 289313, at *3 (6th Cir. Jan. 28, 2021) (holding that where the plaintiff resisted arrest and refused to put his hands behind his back, it was reasonable to "utilize[e] takedowns to subdue Plaintiff and manually forc[e] his hands behind his back so that they could be handcuffed."). *Cf. Norton v. Stille*, 526 F. App'x 509, 511, 513 (6th Cir. 2013) (unreasonable for officer to pull handicapped woman out of motorized scooter and throw her to the ground with such force that her arm was broken in two places where she was not actively resisting and posed no threat); *Burgess v. Fischer*, 735 F.3d 462, 474 (6th Cir. 2013) (unreasonable to take down arrestee rendering him unconscious and fracturing his face,

22

where arrestee had made offensive remarks to officer but was handcuffed and compliant). So Grinnell's excessive-force claims related to his takedown are dismissed.

Second, the Court considers Grinnell's allegations that he was punched, kicked and choked by a number of officers after he was already subdued and lying facedown on the ground. Grinnell alleges he was struck both before and after he was handcuffed. Grinnell testified that a group of officers surrounded him and repeatedly kicked, hit, and choked him for about a minute. (ECF No. 72-9, PageID.1319–1320.) He then stated that, after he was handcuffed and still lying on the ground, most of the officers walked away, but one kicked him in the ribs, laughed, and called him a "mother***er." (*Id.* at PageID.1320.)

Gratuitous force after a subject is restrained and compliant is generally considered excessive. *See, e.g.*, *Morrison v. Bd. Of Trustees Of Green Twp.*, 583 F.3d 394, 407 (6th Cir. 2009) ("Gratuitous violence inflicted upon an incapacitated detainee constitutes an excessive use of force, even when the injuries suffered are not substantial." (internal quotation omitted)); *Schreiber v. Moe*, 596 F.3d 323, 332 (6th Cir. 2010) ("[S]triking a neutralized suspect who is secured by handcuffs is objectively unreasonable."); *Smoak v. Hall*, 345 F. App'x 134, 140 (6th Cir. 2009) ("The law is clear that force can easily be excessive if the suspect is compliant. There is no government interest in striking someone who is neither resisting nor trying to flee."); *Pigram ex rel. Pigram v. Chaudoin*, 199 F. App'x 509, 513 (6th Cir. 2006) ("[A] slap to the face of a handcuffed suspect—even a verbally unruly suspect—is not a reasonable means of achieving anything more than perhaps further antagonizing or humiliating the suspect."). And although an officer is allowed to use some force to handcuff a subject when they are resisting, a reasonable jury could find that several officers repeatedly punching, kicking, and choking a man who was already facedown on the ground is excessive.

Grinnell also states a claim for the officers who failed to intervene to stop this allegedly excessive force. As explained above, a police officer can be liable for failure to intervene during the application of excessive force when: "(1) the officer observed or had reason to know that excessive force would be or was being used; and (2) the officer had both the opportunity and the means to prevent the harm from occurring." *Goodwin v. City of Painesville*, 781 F.3d 314, 328 (6th Cir. 2015) (internal quotation omitted).

The Officers argue that Vines, Porta, and Carroll did not directly engage with Grinnell, so they cannot be liable for excessive force. First, there is a fact dispute whether these three officers physically engaged with Grinnell. Porta, Vines, Thivierge, Leffew, and Carroll testified that they saw more officers than just Wellman and Leffew physically engaged with Grinnell. (ECF No. 72-5, PageID.1147–1152; ECF No. 72-8, PageID.1268; ECF No. 72-11, PageID.1482–1483; ECF No. 72-14, PageID.1553; ECF No. 72-15, PageID.1599.) It is possible that the other officers that engaged with Grinnell are officers present at the scene but not named in this lawsuit, but it is also plausible that some of the other named officers were involved.

But even if Vines, Porta, and Carroll never touched Grinnell, as explained above, they can still be liable for failing to intervene. *See Goodwin*, 781 F.3d at 328. The relevant question is whether each officer was in a position that allowed him to observe the force and to prevent it.

The facts of where each officer was located at the time of the assault are disputed. But again, Grinnell alleges that at least five officers were either assaulting him or standing close by and watching the assault. And Grinnell alleges he was forcefully beaten for about a minute. So, taking Grinnell's deposition testimony as true, and drawing reasonable inferences in his favor, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), the remaining named officers directly observed the assault and were close enough that they would have had the means

and opportunity to stop the ongoing assault. So there remains a question of fact whether Vines, Porta, Carroll (and Wellman and Leffew if it is determined they did not physically participate in the assault) are liable.

## 3.

Contrary to the Officers' assertion, they are not entitled to qualified immunity for this allegedly excessive force. When a police officer commits a constitutional violation, he may still be entitled to qualified immunity if the constitutional right was not "clearly established." *See Pearson v. Callahan*, 555 U.S. 223, 232 (2009); *Ashford v. Raby*, No. 19-1677, 2020 WL 1057393, at *2 (6th Cir. Mar. 5, 2020) ("[E]ven if [the officer's] use of force was unreasonable, [the plaintiff] still can't recover unless its unreasonableness was clearly established at the time." (internal quotation marks omitted)).

It is clearly established that a plaintiff has a "right to be free from physical force when one is not resisting the police." *Wysong v. City of Heath*, 260 F. App'x 848, 856 (6th Cir. 2008). Even in a case where the subject may be giving some resistance, it is clearly established that, where the subject no longer poses a threat, officers are not entitled to choke and repeatedly strike the subject. *See, e.g.*, *Kidis v. Reid*, 976 F.3d 708, 720 (6th Cir. 2020) (denying qualified immunity to officer where "while it was conceivable that Moran would need to apply some force to arrest Kidis safely, there was no conceivable need for Moran to knee strike, choke, and punch Kidis once Moran was on top of Kidis while Kidis was making no effort to resist arrest."); *Coley v. Lucas County*, 799 F.3d 530, 540 (6th Cir. 2015) (explaining that individuals have "a clearly established right not to be gratuitously assaulted while fully restrained and subdued"); *Oliver v. Greene*, 613 F. App'x 455, 459 (6th Cir. 2015) (affirming denial of qualified immunity to defendant prison guard where the video did not blatantly contradict the plaintiff's claim that he did not create a threat and that

the defendant therefore "needlessly injured him by way of excessive force when he took him to the ground, choked him, and repeatedly punched him in the face"); *Michalski v. Sonstrom*, 773 F. App'x 299, 301 (6th Cir. 2019) (holding officers not entitled to qualified immunity where plaintiff alleged that they repeatedly punched and kicked him while he was on the ground).

And the Sixth Circuit also has "repeatedly denied qualified immunity when officers observe the use of excessive force yet fail to intercede." *Kulpa for Est. of Kulpa v. Cantea*, 708 F. App'x 846, 854 (6th Cir. 2017) (citing *Ortiz ex rel. Ortiz v. Kazimer*, 811 F.3d 848, 853 (6th Cir. 2016); *Kent v. Oakland Cty.*, 810 F.3d 384, 397 (6th Cir. 2016); *Goodwin v. City of Painesville*, 781 F.3d 314, 328–29 (6th Cir. 2015)).

Grinnell testified that at least five officers were holding him down, including one who was sitting on his legs. (ECF No. 72-10, PageID.1337, 1363.) And although Grinnell had verbally refused to comply and resisted his arms being pulled behind his back, none of the Officers testified that Grinnell continued to physically resist arrest once he was on the ground. Based on these facts, none of the Officers are entitled to qualified immunity for Grinnell's claims of excessive force and failure to intervene.

## V.

The Court turns finally to the *Monell* claim.

The City of Taylor already filed a motion for summary judgment based on the statue-of-limitations, which the Court denied as to Grinnell's municipal liability claims. (ECF No. 37, PageID.538.) At the motion hearing, the Court stated that if the City wished to file another summary judgment motion after discovery, it would need to seek leave to do so. (ECF No. 38, PageID.597); *see also* E.D. Mich. L.R. 7.1(b)(2) ("A party must obtain leave of court to file more than one motion for summary judgment."). Although the City failed to file a separate motion for

leave, the current motion for summary judgment on behalf of the individual defendants includes arguments for why the City should be granted summary judgment on the merits of Grinnell's municipal liability claims. (ECF No. 72, PageID.929.) So the Court will interpret this as a request for leave to file a second summary judgment motion on behalf of the City. The City argues that Grinnell's municipal liability claims can be dismissed as a matter of law. (ECF No. 72, PageID.929.) And as the Court has previously stated, "it is in the interest of judicial economy to resolve before trial any questions of law." (ECF No. 67, PageID.837.) Moreover, the Plaintiff responded to the *Monell* arguments. So the Court will grant the City leave and consider the merits of its argument that the municipal liability claims should be dismissed.

Municipal liability under 42 U.S.C. § 1983 is governed by *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978). The Supreme Court ruled in *Monell* that "[a] municipality may not be held liable under § 1983 on a respondeat superior theory—in other words, 'solely because it employs a tortfeasor.'" *D'Ambrosio v. Marino*, 747 F.3d 378, 388–89 (6th Cir. 2014) (quoting *Monell*, 436 U.S. at 691). "Instead, a plaintiff must 'demonstrate that, through its deliberate conduct, the municipality was the moving force behind the injury alleged.'" *Jackson v. City of Cleveland*, 925 F.3d 793, 828 (6th Cir. 2019) (internal citations omitted) (quoting *Alman v. Reed*, 703 F.3d 887, 903 (6th Cir. 2013)). "A plaintiff does this by showing that the municipality had a 'policy or custom' that caused the violation of his rights." *Id.* (quoting *Monell*, 436 U.S. at 694). "To show the existence of a municipal policy or custom leading to the alleged violation, a plaintiff can identify: (1) the municipality's legislative enactments or official policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal violations." *Baynes v. Cleland*, 799 F.3d 600, 621 (6th Cir. 2015).

Grinnell appears to make two arguments in support of municipal liability: (1) Corporal Brinker instructed the officers on the scene to engage in unlawful conduct and in doing so, was acting on behalf of the Taylor Police Department and the City (ECF No. 76, PageID.1986), and (2) the City and the Department had a policy of inadequate training for handling a suicidal person or a barricaded gunman (*id.* at PageID.1987–1988).

First, the Court holds that the allegations against Brinker do not constitute a cause of action for municipal liability. As discussed above, "[m]unicipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered. The fact that a particular official—even a policymaking official—has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986) (internal citation omitted). Importantly, a policymaker is the final authority if his "decisions are final and unreviewable and not constrained by the official policies of superior officials." *Waters v. City of Morristown*, 242 F.3d 353, 362 (6th Cir. 2001).

Grinnell does not cite a single fact suggesting that Brinker had final decision-making authority. In fact, the record supports the opposite conclusion. The evening of the incident, Brinker was working on dispatch from the police station and was simply "the person relaying the information about the scene . . . to the officers." (ECF No. 72-4, PageID.1109, 1114–1115.) Brinker testified that his only involvement in the case was communicating information via dispatch, and he was not involved in making any decisions about the actions of the officers. (*Id.* at PageID.1116, 1123 ("I don't know what the officers are going to do, I'm not at the scene.").) Testimony from officers at the scene suggests that there was either a supervising officer at the scene, or the officers simply made decisions based on their own training and experience. (*See* ECF

No. 72-15, PageID.1609. (Officer Carroll: "I don't remember if there was a boss on scene or not. I mean, he ultimately would have been the one making the call at that point."); ECF No. 72-6, PageID.1182–1183 (Officer Regan testified that the officers determined the risk of the situation and the appropriate response based on their training and experience and there was no ranking officer that made the decisions.); ECF No. 72-5, PageID.1145 (Corporal Porta testified that he did not recall receiving any commands or instructions as far as what to do at the scene.).)

The platoon log from the day of the incident shows that Brinker was one of sixteen officers in the platoon. (ECF No. 72-2, PageID.1743.) The platoon is supervised by a lieutenant and a sergeant (Chapman and Hall). (*Id.*) And the Taylor Police Department organizational chart shows that the platoon leaders report to the patrol services commander, and then the Chief of Police. *See Organizational Chart*, Taylor Police Department, https://perma.cc/73RY-QBJE.

So the testimony of Brinker and officers at the scene confirms that Brinker had no decision-making authority that day over the officers on patrol beyond deciding whether to dispatch them. Once on the scene, the officers made decisions based on their own experience and training or based on instructions from a supervisor on the scene. Moreover, it is clear that neither Brinker, nor any of the officers on the scene, had "final authority to establish municipal policy" that was not subject to review by superior officials. *Pembaur*, 475 U.S. at 481; *Waters*, 242 F.3d at 362.

Grinnell's second municipal liability argument, that the City is liable because it failed to properly train its officers, also fails.

In order to show that a municipality is liable under a failure-to-train theory, a plaintiff must establish that (1) the training was inadequate for the tasks the officials must perform; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury. *See Jackson*, 925 F.3d at 834; *Ellis ex rel.*

29

*Pendergrass v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006); *Russo v. City of Cincinnati*, 953 F.2d 1036, 1046 (6th Cir. 1992).

Grinnell argues that the Officers' treatment of him, in addition to their inability to state the policy for handling a suicidal person when asked in their depositions, shows that the police department did not properly train its officers to follow its own policies. (ECF No. 76, PageID.1959–1962, 1986–1987.) The City disagrees, citing deposition testimony from the officers that they receive ongoing training from the department and applied that training on the night of Grinnell's arrest. (ECF No. 72, PageID.930 (internal citations omitted)). The facts and briefing on the adequacy of the police department's training are limited. But the Court need not delve into this issue because the second requirement for a failure-to-train theory, deliberate indifference, dooms Grinnell's claim.

Grinnell can establish deliberate indifference in one of two ways: by showing "prior instances of unconstitutional conduct demonstrating that the [City] had notice that the training was deficient and likely to cause injury but ignored it" or with "evidence of a single violation of federal rights, accompanied by a showing that the [City] had failed to train its employees to handle recurring situations presenting an obvious potential for such a violation." *Jackson*, 925 F.3d at 835 (quoting *Campbell v. City of Springboro*, 700 F.3d 779, 794 (6th Cir. 2012)). To be clear, "[d]eliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Bd. of the Cty. Comm'rs v. Brown*, 520 U.S. 397, 411 (1997).

Although Grinnell suggests that the City should have been on notice of its inadequate training because it "has been sued for similar actions, before and during the time of this lawsuit,"

he provides no further details, let alone record evidence, to support this statement. (ECF No. 76, PageID.1988.)

So Grinnell is left with the second method of showing deliberate indifference. Demonstrating deliberate indifference through a single violation "is available 'in a narrow range of circumstances' where a federal rights violation 'may be a highly predictable consequence of a failure to equip [officers] with specific tools to handle recurring situations.'" *Shadrick v. Hopkins Cty.*, 805 F.3d 724, 739 (6th Cir. 2015) (quoting *Brown*, 520 U.S. at 409).

Here, multiple officers testified about receiving ongoing training on policies and procedures. (ECF No. 72-8, PageID.1262, 1272; ECF No. 72-7, PageID.1232; ECF No. 72-11, PageID.1474–1475.) And while it is unclear if there was a specific or written policy at the time for how to handle a "barricaded gunman," Officers Vines, Regan, Wellman, Porta, and Thivierge were able to describe, at least to some extent, the department's approach for how to handle an armed suicidal person, i.e., create a perimeter, ensure there are no other people barricaded with the subject, convince the subject to exit the building, secure the subject, and then search the building. (ECF No. 72-8, PageID.1271; ECF No. 72-6, PageID.1213; ECF No. 72-7, PageID.1234–1235; ECF No. 72-5, PageID.1142–1143; ECF No. 72-11, PageID.1475.)

It could be argued that it would be best practice to have a specific written policy or policies for dealing with a suicidal "barricaded gunman." And ideally, all officers would be well-versed on how to deal with such a situation. But the record evidence shows that the officers on the scene responded to a potentially volatile and dangerous situation appropriately in light of the City's policy and training—by creating a perimeter, convincing Grinnell to exit his home, and then promptly securing and searching him to ensure the safety of everyone present. The alleged excessive force that survives summary judgment happened *after* Grinnell was secured, and so his

treatment at that point is unrelated to any inadequacy in the department's training for responding to a suicidal barricaded gunman. Thus, it cannot be said that any abuse Grinnell suffered was a "highly predictable consequence of a failure to equip [the Officers] with specific tools to handle recurring situations." *Shadrick*, 805 F.3d at 739.

In sum, there is no evidence in the record to support a finding that the City was deliberately indifferent to inadequate training in the Taylor police force.

## VI.

For the reasons stated above, the Defendants' motion for summary judgment is GRANTED IN PART AND DENIED IN PART.

Renee Rosebohm, W. Brinker, John Regan, Joe Thivierge, and the City of Taylor are DISMISSED WITH PREJUDICE as defendants. Counts I (the *Monell* claim) and VI (cruel and unusual punishment) are DISMISSED WITH PREJUDICE. Counts II, III, and IV (the state law claims) are DISMISSED WITHOUT PREJUDICE.

Grinnell's excessive force claim, related to his alleged assault while he was subdued lying on the ground only, will proceed to trial against defendants Chad Vines, Nicholas Wellman, Adam Leffew, S. Porta, and Adam Carroll.

SO ORDERED.

Dated:  May 3, 2021                                    s/Laurie J. Michelson
    Detroit, Michigan                               LAURIE J. MICHELSON
                                          United States District Judge